## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| REBECCA HILL, RANETTE KESTELOOT, CARRIE LONG, JANE MCNAMES, SHERRY SCHUMACHER, and JILL ANN WISE, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | No. 15-cv-10175 |
| v. | ) ) | |
| SERVICE EMPLOYEES INTERNATIONAL UNION, HEALTHCARE ILLINOIS, INDIANA, MISSOURI, KANSAS; TOM TYRRELL, in his official capacity as Director of Illinois Department of Central Management Services; GREGORY BASSI, in his official capacity as Acting Secretary of Illinois Department of Human Services, | ) ) ) ) ) ) ) ) ) ) | COMPLAINT |
| Defendants. | ) | |

## INTRODUCTION

This case concerns whether the government can constitutionally force citizens to accept a mandatory representative to lobby the government over public policies that may affect them. Plaintiffs are Illinois citizens who provide services to persons enrolled in public-aid programs. Specifically, Plaintiffs Rebecca Hill, Jane McNames, and Jill Ann Wise provide home-based care to persons with disabilities who are enrolled in the Illinois Home Services Program ("HSP"), 20 ILL. COMP. STAT. 2405/0.01–/17.1 (2015), which is a Medicaid program. Plaintiff Ranette Kesteloot provides child care for relatives who participate in the Illinois Child Care Assistance Program ("CCAP"), 305 ILL. COMP. STAT. 5/9A-11 (2015). Plaintiffs Carrie Long and Sherry Schumacher operate home-based child care businesses that serve customers who are enrolled in the CCAP.

The State of Illinois is forcing Plaintiffs and similarly situated individuals to accept Service Employees International Union, Healthcare Illinois, Indiana, Missouri, Kansas ("SEIU-HCII") as their "exclusive representative" for lobbying the State over its operation of these public programs.

1

By so doing, the State and SEIU-HCII are violating Plaintiffs' rights under the First Amendment to the United States Constitution, as secured against state infringement by the Fourteenth Amendment and 42 U.S.C. § 1983, to choose individually with whom they associate to petition the government for redress of grievances.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331, because it arises under the United States Constitution, and 28 U.S.C. § 1343, because Plaintiffs seek relief under 42 U.S.C. § 1983. This Court has authority under 28 U.S.C. §§ 2201 and 2202 to grant declaratory relief and other relief based thereon.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the claims arise in this judicial district; Plaintiffs McNames, Johnson, and Schumacher reside and do business in this judicial district; and Defendants do business and operate in this judicial district.

## PARTIES

4.    Defendant Tom Tyrrell is sued in his official capacity as the Director of Illinois' Department of Central Management Services ("CMS").

5.    Defendant Gregory Bassi is sued in his official capacity as the Acting Secretary of Illinois' Department of Human Services ("DHS").

6.    Defendant SEIU-HCII is a labor organization that transacts business and maintains its main offices in this judicial district.

7.    Plaintiff Rebecca Hill is an HSP provider and lives in Cisne, Illinois

8.    Plaintiff Ranette Kesteloot provides care for her great-grandchildren, who receive assistance through CCAP, and lives in Kankakee, Illinois.

9.    Plaintiff Carrie Long lives and operates a day care home called Home Away from Home Daycare in Springfield, Illinois, where her customers include families enrolled in CCAP.

10.   Plaintiff Jane McNames is an HSP provider and lives in Caledonia, Illinois.

11.   Plaintiff Sherry Schumacher lives and operates a day care home called Sherry's Littlest Angels in South Beloit, Illinois, where her customers include families enrolled in CCAP.

12.   Plaintiff Jill Ann Wise is an HSP provider and lives in Mount Carmel, Illinois.

## FACTS

### A.    Medicaid Providers

13.   HSP is a Medicaid-waiver program partially funded by the federal government. *See* 20 ILL. COMP. STAT. 2405/0.01–/17.1; Ill. Admin. Code tit. 89, §§ 676.10–686.1410. HSP pays for services to be provided for income-eligible persons with disabilities, which enables those persons to live at home and avoid institutionalization.

14.   Among other things, persons with disabilities enrolled in the HSP can use their subsidies to hire "personal assistants" to assist them with activities of daily living in their homes, such as eating and dressing.

15.   Personal assistants are employed by persons enrolled in the HSP and not by the State. In addition to other responsibilities, program participants are responsible for locating, hiring, training, supervising, evaluating, and terminating their personal assistants. The HSP subsidizes a program participant's costs of employing a personal assistant.

16.   Many personal assistants are related to the person receiving the care. A significant number of personal assistants also live in the same residence as the person with disabilities for whom they provide care.

17.   Plaintiff Rebecca Hill provides personal care services to her daughter who requires constant care and supervision.

18.   Plaintiff Jane McNames provides personal care services to her son, who requires constant care and supervision due to quadriplegia.

3

19.   Plaintiff Jill Ann Wise provides personal care services to her daughter, who requires constant care and supervision due to Rett syndrome.

20.   Approximately 25,000 personal assistants are employed by persons with disabilities who are enrolled in the HSP each year.

## B.   Child Care Providers

21.   Illinois operates a public-assistance program that subsidizes the child care expenses of qualified low-income families called the CCAP. 305 ILCS 5/9A-11; ILL. ADMIN. CODE tit. 89, § 50.101 et seq. CCAP is partially funded by, and must be administered in accordance with, the federal Child Care and Development Fund program. 45 C.F.R. § 98.10.

22.   CCAP pays for child care services provided to enrolled families up to a maximum rate set by DHS in accordance with legislative appropriations and federal requirements. *See* 305 ILL. COMP. STAT. 5/9A-11(f); 45 C.F.R. § 98.43. However, the vast majority of families enrolled in CCAP also pay a designated co-payment to their day care providers, the amount of which is set by DHS through regulation. *See* ILL. ADMIN. CODE tit. 89, §§ 50.310, 50.320. Day care providers can charge enrolled families additional fees for their services.

23.   Families enrolled in CCAP can choose their own qualified child care provider, including any licensed day care home, license-exempt provider, or day care center. ILL. ADMIN. CODE tit. 89, § 50.410; 45 C.F.R. § 98.30.

24.   "Day care homes" are private, home-based businesses that provide child care services to the public. *See* 225 ILL. COMP. STAT. 10/2.18, 10/2.20. Day care homes are businesses for tax and other purposes, and sometimes employ employees. Day care homes are usually sole proprietorships but can also be partnerships or incorporated.

25.   Operating a day care home that serves more than three children requires a license or permit from the Illinois Department of Children and Family Services. *See* 225 ILL. COMP. STAT.

4

10/3; ILL. ADMIN. CODE tit. 89, §§ 406.1–.27, 408.1–.135. A day care home with a standard license can serve up to twelve children, 225 ILL. COMP. STAT. 10/2.18; while a day care home with a "group" license can serve up to sixteen children, *id.* 10/2.20.

26.  "License-exempt child care providers" are individuals who do not need a license to provide child care services to children. There are several types of license-exempt providers:

      a.  Day care homes that either serve no more than three children or children from the same household, ILL. ADMIN. CODE tit. 89, § 50.410(e);

      b.  Relative care providers who provide day care services, either in their own home or in the child's home, to children to whom the providers are related, *id.* § 50.410(f), (h); and

      c.  Non-relative care providers who provide day care services, in the child's home, to no more than three children or children from the same household, *id.* § 50.140(g).

27.  Approximately 69.7% of license-exempt providers in fiscal year 2013 were relative care providers. State of Ill. Dep't of Human Serv., Illinois Child Care Report FY 2013, 9 (2013), https://www.dhs.state.il.us/OneNetLibrary/27897/documents/HCDdocuments/ChildCare/2013Reportfinalsingles.pdf.

28.  The State contracts with sixteen private Child Care Resource and Referral Agencies ("CCR&Rs") to administer many aspects of CCAP and to support child care providers and enrolled families. *Id.* 13. Among other things, CCR&Rs provide referral services that refer enrolled families to available child care providers and offer extensive training and support services to child care providers.

29. In Fiscal Year 2013, 7,345 day care homes and 52,364 license-exempt family child care providers received payments from CCAP for services provided to families enrolled in this public-assistance program. *Id.* 9.

30. Hereinafter, "child care provider" shall refer to individuals who operate licensed day care homes or are license-exempt family child care providers, and who serve one or more children en-rolled in CCAP.

31. Plaintiff Ranette Kesteloot is a license-exempt family child care provider who provides care for her great-grandchildren who receive assistance through CCAP.

32. Plaintiff Carrie Long is a child care provider who operates a day care home called Home Away from Home Daycare, which serves, or served, one or more customers enrolled in CCAP.

33. Plaintiff Sherry Schumacher is a child care provider who operates a day care home called Sherry's Littlest Angels, which serves, or served, one or more customers enrolled in CCAP.

34. Child care providers are not employed by the State of Illinois. Rather, day care homes are private businesses that have one or more customers who partially pay for the day care home's ser-vices with public-aid monies, and license-exempt family child care providers are generally grand-parents, aunts, or cousins who receive public monies for caring for children to whom they are re-lated.

## C. Illinois Deems Personal Assistants, Child Care Providers, and Other Citizens to be Public Employees Solely for Unionization Purposes.

35. In 2003, former Illinois Governor Rod Blagojevich initiated a scheme to force personal assistants to accept and financially support SEIU-HCII as their representative vis-à-vis the State in exchange for SEIU-HCII's political support and campaign contributions. *See Harris v. Quinn*, 134 S. Ct. 2618, 2626 (June 30, 2014).

6

36. On March 7, 2003, Governor Blagojevich issued Executive Order 2003-08 ("EO 2003-08"). Exec. Order No. 2003-8, https://www.illinois.gov/Government/ExecOrders/Documents/2003/execorder2003-8.pdf. EO 2003-08 recognized that personal assistants are not public employees but nevertheless provided:

> The State shall recognize a representative designated by a majority of the personal assistants as the exclusive representative of all personal assistants, accord said representative all the rights and duties granted such representatives by the Illinois Public Labor Relations Act, 5 ILCS 315/1 et seq., and engage in collective bargaining with said representative concerning all terms and conditions of employment of personal assistants working under the Homes Services Program that are within the State's control.

*Id.*

37. On July 16, 2003, Governor Blagojevich codified EO 2003-08 by signing Public Act 93-0204, which amended Section 3 of the Disabled Persons Rehabilitation Act to provide as follows:

> Solely for the purposes of coverage under the Illinois Public Labor Relations Act (5 ILCS 315), personal care attendants and personal assistants providing services under the Department's Home Services Program shall be considered to be public employees and the State of Illinois shall be considered to be their employer as of the effective date of this amendatory Act of the 93rd General Assembly, but not before. The State shall engage in collective bargaining with an exclusive representative of personal care attendants and personal assistants working under the Home Services Program concerning their terms and conditions of employment that are within the State's control. Nothing in this paragraph shall be understood to limit the right of the persons receiving services defined in this Section to hire and fire personal care attendants and personal assistants or supervise them within the limitations set by the Home Services Program. The State shall not be considered to be the employer of personal care attendants and personal assistants for any purposes not specifically provided in this amendatory Act of the 93rd General Assembly, including but not limited to, purposes of vicarious liability in tort and purposes of statutory retirement or health insurance benefits. Personal care attendants and personal assistants shall not be covered by the State Employees Group Insurance Act of 1971.

7

20 ILCS 2405/3(f); 2003 Ill. Legis. Serv. 92-204 (West). Public Act 93-0204 also made conforming amendments to the Illinois Public Labor Relations Act ("IPLRA"), 5 ILL. COMP. STAT. 315/1–128.

38. On or around July 26, 2003, the State designated SEIU-HCII to be the "exclusive representative" of personal assistants under the IPLRA for purposes of collectively bargaining with the State over aspects of its HSP.

39. On February 18, 2005, Governor Blagojevich issued Executive Order 2005-01 ("EO 2005-01"), which is similar to EO 2003-08 but targets child care providers. Exec. Order No. 2005-1, https://www.illinois.gov/Government/ExecOrders/Documents/2005/execorder2005-1.pdf. EO 2005-01 required:

> The State shall recognize a representative designated by a majority of day care home licensed and license exempt providers, voting in a mail ballot election, as the exclusive representative of day care home providers that participate in the State's child care assistance program, accord said representative the same rights and duties granted to employee representatives by the Illinois Labor Relations Act, 5 ILCS 315/1 et seq., and engage in collective negotiations with said representative concerning all terms and conditions of the provision of services for day care home providers under the State's child care assistance program that are within the State's control.

*Id.* 2–3.

40. On July 15, 2005, Governor Blagojevich recognized SEIU-HCII to be the exclusive representative of all child care providers pursuant to EO 2005-01.

41. On July 26, 2005, Governor Blagojevich codified EO 2005-01 by signing into law Public Act 94-0320. 5 ILL. COMP. STAT. 315/3–/28; 2005 Ill. Legis. Serv. P.A. 94-320 (West). This Act made child care providers public employees solely for purposes of IPLRA, *see* 5 ILL. COMP. STAT. 315/3(n) and 305 ILL. COMP. STAT. 5/9A-11(c-5); and provides that SEIU-HCII "shall be

considered to be the exclusive representative of the child and day care home providers defined in this Section," 5 ILL. COMP. STAT. 315(f).

42.    On June 29, 2009, Illinois Governor Pat Quinn attempted to impose exclusive representation on additional personal assistants by issuing Executive Order 2009-15. Exec. Order No. 2009-15, https://www.illinois.gov/Government/ExecOrders/Documents/2009/execorder2009-15.pdf. The executive order called for Illinois to recognize an exclusive representative of all personal assistants who serve persons enrolled in Illinois' Home-Based Support Services Program, 405 ILL. COMP. STAT. 80/20-1, which is a Medicaid program that serves adults with severe mental disabilities. *Id.*

43.    In January 2013, Governor Quinn moved to impose exclusive representation on yet another group of individuals, namely registered nurses and therapists, by signing into law Public Act 97-1158. 5 Ill. Comp. Stat. 315/3, /7; 2012 Ill. Legis. Serv. P.A. 97-1158 (West). The Act deems "individual maintenance home health workers" to be public employees solely for purposes of IPLRA. 5 Ill. Comp. Stat. 315/3(n). Individual maintenance home health workers are "registered nurse[s]" and "licensed-practical nurse[s]" who provide in-home services, and therapists who provide "in-home therapy, including the areas of physical, occupational and speech therapy." ILL. ADMIN. CODE tit. 89, § 676.40(d).

44.    Public Act 97-1158 also extended the IPLRA to encompass all personal assistants and individual maintenance home health workers who work under the HSP "no matter whether the State provides those services through direct fee-for-service arrangements, with the assistance of a managed care organization or other intermediary, or otherwise." 5 ILL. COMP. STAT. 315/3(n); 2012 Ill. Legis. Serv. P.A. 97-1158.

45.    Through the actions set forth above, Illinois has falsely deemed individuals who are not actually State employees to be State employees solely for purposes of the IPLRA and unionization.

9

D.    **SEIU-HCII Enters into Contracts with Illinois that Force Personal Assistants and Child Care Providers to Support SEIU-HCII.**

46.    By making SEIU-HCII the "exclusive representative" of personal assistants and child care providers under IPLRA, Illinois granted SEIU-HCII legal authority to act as the agent of all personal assistants and child care providers for purposes of petitioning and contracting with the State over certain HSP and CCAP policies.

47.    SEIU-HCII exercised its legal authority by negotiating and entering into successive collective bargaining agreements ("contracts") with the State as the exclusive representative of all personal assistants and child care providers. The most recent contracts, which were effective until June 30, 2015, shall be referred to as the "HSP Contract" and "CCAP Contract" and are attached as Exhibits A and B, respectively, and incorporated into the Complaint.

48.    The contracts primarily require that Illinois assist SEIU-HCII with increasing its membership ranks by requiring that Illinois:  provide SEIU-HCII with detailed lists of personal information about all personal assistants and child care providers; mail union membership materials to personal assistants and child care providers; refer all questions concerning union representation and membership to SEIU-HCII; and cause personal assistants and child care providers to attend, as part of orientations and/or trainings, thirty-minute SEIU-HCII presentations, the purpose of which is to cause the individuals to become members of SEIU-HCII.

49.    The HPS and CCAP Contracts also require Illinois to deduct membership dues for SEIU-HCII from payments made to personal assistants and child care providers and to seize compulsory "fair share" fees from all payments made to personal assistants and child care providers who are not members of SEIU-HCII. As a result of the foregoing and prior contracts that required similar dues and fee deductions, SEIU-HCII seized over $30 million in compulsory fees from per-

sonal assistants between fiscal years 2009 and 2013, and more than $44 million in membership dues and compulsory fees from child care providers between fiscal years 2009 and 2013.

50.   In or around July 2014, the State and SEIU-HCII apparently stopped seizing compulsory fees from nonmember personal assistants and child care providers in the wake of the United States Supreme Court's decision in *Harris v. Quinn*, 134 S. Ct. 2618 (2014), that such fee seizures from non-State employees are unconstitutional.

51.   The HSP Contract called for the State to pay certain hourly reimbursement rates to personal assistants. However, actual payment rates are subject to legislative appropriations and to federal law that requires payment rates be "consistent with efficiency, economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A). On information and belief, State policymakers could competently establish personal-assistant payment rates without bargaining with SEIU-HCII over those rates.

52.   The CCAP Contract called for the State to establish certain CCAP reimbursement rates. Ex. B, at Art. VII. However, actual payment rates are subject to legislative appropriations; administrative rulemaking, *see* 305 ILL. COMP. STAT. 5/9A-11(f); and federal regulations that require states to base their child care rates on a biennial market-rate survey and set child care rates at amounts sufficient to ensure that subsidized children have access to childcare services equal to unsubsidized children, *see* 45 C.F.R. § 98.43. DHS conducts the requisite biennial market-rate surveys. On information and belief, State policymakers could competently establish CCAP payment rates without bargaining with SEIU-HCII over those rates.

53.   The HSP and CCAP Contracts require that the State make contributions to an SEIU-HCII health fund for the ostensible purpose of offering health insurance to personal assistants or

11

child care providers. However, a low percentage of personal assistants and child care providers, estimated to be less than 20%, receive health benefits from SEIU-HCII.

54.   On information and belief, SEIU-HCII's petitioning and contracting with the State is not necessary, and has not been necessary, to improve the services that the HSP or CCAP provide to persons with disabilities or low-income families in need of child care services.

**E.     Personal Assistants and Child Care Providers Are Being Forced to Associate with Both SEIU-HCII and Its Expressive Activities.**

55.   Under the IPLRA, an organization certified to be the exclusive representative of a bargaining unit of individuals represents and speaks for all individuals in that unit, *see* 5 ILL. COMP. STAT. 315/6(c-d), regardless of membership status.

56.   The State's certification and ongoing recognition of SEIU-HCII as the exclusive representative of all personal assistants and child care providers associates and affiliates these individuals with SEIU-HCII because it forces them into a mandatory agency relationship with SEIU-HCII, in which SEIU-HCII has legal authority to act as their agent for petitioning and contracting with the State over certain HSP and CCAP policies.

57.   SEIU-HCII has met, spoken to, and otherwise petitioned State policymakers concerning HSP and CCAP policies and funding in its capacity as the exclusive representative of all personal assistants and child care providers, and will continue to do so as long as SEIU-HCII is their exclusive representative.

58.   SEIU-HCII, in its capacity as an exclusive representative of all personal assistants and child care providers, uses other expressive means to influence State policymakers, including members of the General Assembly and the public, to support SEIU-HCII's positions concerning HSP and CCAP policies and funding. Among other things, SEIU-HCII has conducted public demonstrations and protests; conducted television, radio, and print advertising campaigns; and engaged in

12

other forms of political advocacy to influence State policymakers and the public to support SEIU-HCII's positions concerning HSP and CCAP policies and funding.

59.   For example, on June 29, 2015, SEIU-HCII began airing two television commercials designed to pressure Governor Rauner and state policymakers to accede to SEIU-HCII's demands in collective bargaining for new contracts governing the operation of the HSP and CCAP programs. SEIU-HCII also unveiled a new website with the same purpose, www.dangerouscuts.org.

60.   The HSP and CCAP policies over which SEIU-HCII petitions and contracts with the State are matters of public and political concern. Among other things, the manner in which these programs are administered affects persons with disabilities and low-income families who need child care services.

61.   SEIU-HCII's petitioning and contracts concerning HSP and CCAP also impact the programs' budgets, which then affects the legislative appropriations necessary to support the programs. Appropriations from Illinois' General Fund for HSP and CCAP were $334,075.4 and $143,490.7 million, respectively, in Fiscal Year 2014 alone. The funding levels for both programs are a matter of political and public concern, were subjects of public controversy in prior years, and are currently a subject of public controversy.

62.   SEIU-HCII's expressive activities concerning HSP and CCAP policies often address other public policies that SEIU-HCII supports, such as increasing taxes, raising the minimum wage, and making changes to immigration policy. To offer one example, a "lobby day" conducted by SEIU-HCII at Illinois' State Capitol in 2012 to influence the proposed budget for the HSP also called for changes to corporate tax policies.

63.   SEIU-HCII characterizes itself as progressive organization; and is viewed, and can be characterized as, a progressive advocacy group. SEIU-HCII often advocates for public policies that are viewed, and can be characterized as, liberal or progressive; and often endorses and supports

13

public officials and candidates for public office who are viewed, and can be characterized as, liberal or progressive.

64. By making SEIU-HCII the exclusive representative of all personal assistants and child care providers for petitioning and contacting the State, Illinois associates and affiliates all personal assistants and child care providers with SEIU-HCII and its petitioning, contracts, and related expressive activities.

65. SEIU-HCII itself asserts on its website that "[m]ore than 35,000 home child care providers and child care center teachers and staff are united in SEIU Child Care & Early Learning, a division of [SEIU-HCII]," and that "Illinois home child care providers were the first in the country to unite our voices in SEIU . . . ." *Child Care & Early Learning*, SEIU HEALTHCARE ILLINOIS, INDIANA, MISSOURI, KANSAS, http://www.seiuhcilin.org/category/child-care-early-learning/ (last visited Nov. 2, 2015).

66. Plaintiffs oppose being forced to accept SEIU-HCII as their exclusive representative for petitioning and contracting with the State. They do not want to be forced into an agency relationship with this advocacy group or otherwise affiliated with this advocacy group. Nor do Plaintiffs want to be associated and affiliated with SEIU-HCII's petitioning, contracts, and other expressive activities.

## COUNT I

**Forcing Plaintiffs to Associate with SEIU-HCII violates the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.**

67. Plaintiffs re-allege and incorporate by reference the paragraphs set forth above.

68. The First Amendment to the United States Constitution guarantees each individual a right to choose whether, how, and with whom he or she associates to "petition the Government for a redress of grievances" and engage in "speech." A state infringes on these First Amendment rights

14

when it compels citizens to associate with an expressive organization or its expressive activities. That infringement is subject to at least exacting constitutional scrutiny, and is permissible only if it serves a compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms.

69.   The Defendants, by compelling Plaintiffs and other personal assistants and child care providers to associate with SEIU-HCII as their exclusive representative, and by associating Plaintiffs and other personal assistants and child care providers with SEIU-HCII's expressive activities without their consent, are violating Plaintiffs' First Amendment rights, as secured against state infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983. No compelling, or otherwise sufficient, state interest justifies this infringement on the personal assistant and child care providers First Amendment rights.

70.   By being forced to associate with SEIU-HCII, a group with which Plaintiffs would not otherwise associate, Plaintiffs are suffering the irreparable harm and injury inherent in a violation of First Amendment rights for which there is no adequate remedy at law. Unless the Court enjoins these violations, Plaintiffs will continue to suffer irreparable harm and injury.

71.   The following statutory provisions are unconstitutional, both on their face and as applied to Plaintiffs, to the extent that they deem personal assistants or child care providers subject to IPLRA:  5 ILL. COMP. STAT. 315/3(f)(iv-v); 5 ILL. COMP. STAT. 315/3(n); 5 ILL. COMP. STAT. 315/3(o); 5 ILL. COMP. STAT. 315/7; 20 ILL. COMP. STAT. 2405/3(f); and 305 ILL. COMP. STAT. 5/9A-11.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs request that this Court:

A.  Issue a declaratory judgment that it is unconstitutional under the First Amendment, as secured against state infringement by the Fourteenth Amendment to the United States Constitution

15

and 42 U.S.C. § 1983, for Defendants to compel Plaintiffs and other personal assistants and child care providers to associate with an exclusive representative and its expressive activities.

B.  Issue a declaratory judgment that the statutory provisions described in paragraph 71 are unconstitutional under the First Amendment, as secured against State infringement by the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983, and are null and void;

C.  Issue preliminary and permanent injunctions that enjoin enforcement of the statutory provisions described in paragraph 71 and enjoin Defendants from requiring Plaintiffs to associate with an exclusive representative and its expressive activities;

D.  Award Plaintiffs nominal and compensatory damages from SEIU-HCII;

E.  Award Plaintiffs their costs and reasonable attorney fees pursuant to the Civil Rights Attorneys' Fees Award Act of 1976, 42 U.S.C. § 1988; and

F.  Grant such other and additional relief as the Court may deem just and proper.

Dated:  November 10, 2015

Respectfully submitted,

/s/ Jacob H. Huebert
Jacob H. Huebert
Jeffrey M. Schwab
Liberty Justice Center
190 S. LaSalle Street, Suite 1500
Chicago, Illinois 60603
(312) 263-7668 (phone)
(312) 263-7702 (facsimile)
jhuebert@libertyjusticecenter.org
jschwab@libertyjusticecenter.org

William L. Messenger
  (*pro hac vice motion to be filed*)
Amanda K. Freeman
  (*pro hac vice motion to be filed*)
c/o The National Right to Work Legal Defense
    Foundation
8001 Braddock Road, Suite 600
Springfield, Virginia 22160

(703) 321-8510
(703) 321-9319 (fax)
wlm@nrtw.org
akf@nrtw.org

*Attorneys for Plaintiffs*